Lucius DONALDSON; George G. Melbourne; the Farmworker Rights Organization; Nelson Felix, Plaintiffs–Appellants,

and

Philama Jean Dore; Saintane Dore, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF LABOR; William E. Brock, Secretary, United States Department of Labor; William Haltigan, Regional Administrator, Region III Employment and Training Administration, U.S. Depart-

ment of Labor; U.S. Immigration & Naturalization Service; Kent Barley; Stanley Bauserman; Robert S. Boyd; Harvey L. Brumback; Drilake Farms, Inc.; Fruit Hill Orchard; Glaize Virginia Orchards; W.R. Kiser; Marker–Miller Orchards; Kenneth McDonald; Roy McDonald; Orchard Management Company; Harold G. Nichols; R & T Packing; C.L. Robinson Corp.; Reb & Co.; Rinker Orchards, Inc.; D.K. Russell & Sons, Inc.; Senseny South Corporation; Bruce Swing; Timber Ridge Fruit Farm; Westwood Farm, Inc.; Robert Wyatt; Triple S. Associates; White Hall Orchards; Hearty–Virginia, Inc.; Fredrickson, Inc.; H.F. & T. Byrd, Inc.; Mt. Clifton Fruit Co.; John D. Wood; Darrell Worley; Ewers Orchards; Roland Snapp; Whitham Orchards, Inc.; Donald J. Kulick, Administrator for Regional Management, Defendants–Appellees,

and

Long Creek Farm; G. Hardy Grim, Defendants.

No. 88–2920.

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1990.

Decided April 3, 1991.

As Amended May 6, 1991.

Garry G. Geffert, West Virginia Legal Services Plan, Inc., argued, Martinsburg, W. Va. (Shelly Davis, Edward J. Tuddenham, Migrant Legal Action Program, Inc., Washington, D.C., on the brief), for plaintiffs-appellants.

Christopher Alan Weals, Seyfarth, Shaw, Fairweather & Geraldson, argued, Washington, D.C. (Thomas E. Wilson, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., W.A. Johnston, Ronald J. Brown, Harrison & Johnston, Winchester, Va., on the brief), for defendants-appellees.

Before WIDENER and PHILLIPS, Circuit Judges, and McMILLAN, Senior United States District Judge for the Western District of North Carolina, sitting by designation.

PHILLIPS, Circuit Judge:

This is an appeal by a class of farmworkers (workers) from the district court's dismissal by summary judgment of their class action against Virginia and West Virginia apple growers (growers). The workers' claim is that wages paid them during the 1986 harvest season were less than those required by applicable federal law, thereby entitling them to injunctive and monetary relief. The district court granted the growers' motion for summary judgment on the sole basis that because the Department of

Labor (DOL) had approved the wages offered and paid and the growers reasonably had relied upon the approval, the growers' reliance constituted an absolute defense to any claim for underpayment the workers might assert, whatever its source. The workers' appeal requires us to decide three issues: whether the Wagner–Peyser Act (Wagner–Peyser), 29 U.S.C. §§ 49, *et seq.*, upon which the workers' claim as originally pleaded was based, confers a private right of action; if not, whether the district court erred in denying the workers leave to invoke by amendment the private right of action conferred by § 504 of the Migrant and Seasonal Agricultural Worker Protection Act (MSAWPA), 29 U.S.C. §§ 1801 *et seq.;* and whether, if the workers properly could invoke a private right of action under either statutory regime, the district court nevertheless properly granted summary judgment on the basis that the growers' reasonable reliance on DOL approval of the wages offered and paid would defeat a claim under either.

Because we think it sufficiently questionable under current law that a private right of action can be implied in Wagner–Peyser, we conclude that we should assume, without deciding, for purposes of this appeal that it may not be. On that basis, we then conclude that the district court erred in not permitting the workers to invoke by amendment the private right of action specifically conferred by § 504 of AWPA. And we further conclude that because the district court erred in its factual premise that the DOL had approved in advance the challenged wage payments offered and then made by the growers, it necessarily erred in holding that the growers' reasonable reliance on that approval barred any recovery by the workers.

We therefore reverse the grant of summary judgment and remand for further proceedings.

## I

The legal framework within which this controversy arose is that established by relevant provisions of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101, *et seq.*, and the Wagner–Peyser Act, 29 U.S.C. §§ 49, *et seq.*, which regulate the compensation and working conditions of foreign and domestic migrant farmworkers under certain circumstances. At the time the events here in issue occurred, agricultural employers could petition for permission to employ foreign workers in times of labor shortage pursuant to the "H–2" provisions of the INA. *See* 8 U.S.C. § 1101(a)(15)(H)(ii). Pertinent regulations required employers to secure certification from the DOL that qualified persons in the United States were not available to meet the labor demand and that employment of foreign workers would not adversely affect the wages and working conditions of similarly employed workers in the United States. *See* 8 C.F.R. § 214.2(h)(3) (1986). Detailed DOL regulations governed this certification process. *See* 20 C.F.R., part 655 (1986). Regulations adopted pursuant to the Wagner–Peyser Act established an interstate clearance system to provide employers with a means for recruiting workers from other states to meet local labor demand. *See id.;* 20 C.F.R. §§ 653.-500–.503 (1986). Any employer who wanted to employ temporary foreign workers was therefore required first to seek U.S. workers through local employment service offices participating in the interstate clearance system. The net result of this complicated regulatory scheme is that U.S. workers are given preference over foreign workers for jobs that become available and, to the extent temporary foreign workers are employed, their employment may not adversely affect the compensation and working conditions of U.S. workers. *See generally Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 594–96, 102 S.Ct. 3260, 3262–63, 73 L.Ed.2d 995 (1982).

An employer who anticipates a labor shortage files a "temporary labor certification application" with the local employment service office. Included in the application is a "job offer," the employer's basic recruitment tool, which details the terms and conditions of employment offered. If DOL determines that the job offer meets regulatory standards, it is approved for circula-

tion through the interstate clearance system. After the prescribed recruitment period is complete, DOL either approves or denies temporary labor certification for the employer. If approved, the employer can then petition the Immigration and Naturalization Service for admission of temporary foreign workers. These foreign workers, and any U.S. workers recruited through the interstate system, are compensated according to the terms of the job offer. Thus all job offers by employers seeking to recruit temporary labor must comply with regulations governing the temporary labor certification process (H–2) and regulations governing the interstate clearance system.

Before the 1986 apple season, the growers in this case submitted applications seeking to employ foreign workers under the H–2 provisions. For over twenty years, these growers had paid their workers on a piece rate basis.[1] In 1986, however, DOL was under a permanent injunction to enforce a proportional increase in the piece rate consistent with any annual increase in the "adverse effect wage rate" (AEWR),[2] see 20 C.F.R. § 655.207(c) (1986); *Feller v. Brock,* 802 F.2d 722, 725 (4th Cir.1986); *NAACP v. Donovan (NAACP II),* 566 F.Supp. 1202, 1207–07 (D.D.C.1983). In obvious response, the growers decided to abandon the piece rate payment method and offer a flat hourly rate equal to the AEWR: $4.72 for Virginia; $4.49 for West Virginia. Many of the growers also included in their job offers the following bonus provision:

> Worker's pay may be supplemented from time to time with bonuses based on the type of picking, quality of fruit picked,

productivity of worker, and duration of employment. Such additional payments will be at the option and discretion of the grower. All workers employed (foreign and domestic) will be paid identical bonuses for equal and comparable work.

Joint Appendix (J.A.) at 131. DOL had anticipated the growers' proposal to use a flat hourly wage rate and adopted the policy that job offers should not be rejected "solely" on the ground that the prevailing past practice had been to pay a piece rate wage or that adoption of the hourly rate method of payment might have an adverse effect on domestic workers because their hourly earnings might not be as high as when they were paid on a piece rate.[3] DOL accordingly approved the hourly wage rate as offered, but rejected the bonus provision as inconsistent with the disclosure requirements in 20 C.F.R. § 653.501(d)(2)(x).[4] The growers then amended their job offers to eliminate the bonus provisions.

In this state of affairs, the workers filed this action in July 1986, seeking to enjoin the DOL from approving, and the growers from offering, the hourly wage rates proposed.[5] The workers charged that because the clearance system regulations mandated that wages offered be not less than "prevailing wages" of similarly employed agricultural workers in the area of intended employment, *see id.* § 653.501(d)(4), and the prevailing wage under the piece rate system had yielded average earnings of over $6.00 per hour, the growers were obligated to pay a flat hourly wage rate of over $6.00. The district court denied the work-

---

1. The "piece" rate was based on the harvesting of boxes or bushels of apples. *See NAACP v. Donovan (NAACP I),* 558 F.Supp. 218, 220–21 (D.D.C.1982).

2. DOL sets the minimum wage rate that must be paid to migrant foreign and U.S. workers, the "adverse effect wage rate," to ensure that the wages of similarly employed domestic workers will not be adversely affected. *See* 20 C.F.R. §§ 655.200(b), .202(b)(9) (1986).

3. DOL Acting Administrator for Regional Management Barbara Ann Farmer issued the policy memorandum, which became known as the "Farmer Memorandum." *See* J.A. at 277–78.

4. "Any bonus or work incentive payments or other expenses which will be paid by the employer in addition to the basic wage rate, including the anticipated time period(s) within which such payments will be made," must be included in the job order. 20 C.F.R. § 653.501(d)(2)(x) (1986).

5. The action was originally filed in the Eastern District of Pennsylvania, but was transferred by that court to the Western District of Virginia pursuant to 28 U.S.C. § 1404(a).

ers request for a preliminary injunction on August 22, 1986.

While this action was in its preliminary stages, one of the grower defendants filed in the same district court an action challenging DOL's rejection of the bonus language in the job offers. The district court granted a temporary restraining order preventing DOL from rejecting the company's H–2 application solely because of the bonus language. *See C.L. Robinson Corp. v. DOL,* No. 86–0417–R (W.D.Va. Aug. 7, 1986). Other grower defendants then sought to amend their offers to include the bonus language, but DOL again rejected the applications. In rejecting the vague bonus language, DOL recognized and pointed out that an hourly wage rate plus an unspecified bonus could be structured effectively to create a piece rate payment plan that would avoid the proportional increases mandated for piece rate payments by the *NAACP II* injunction. *See, e.g.,* J.A. at 126–28. These growers then filed an action similar to that of the first grower and obtained a preliminary injunction prohibiting DOL from rejecting the discretionary bonus language in their H–2 applications. *See Senseny South Corp. v. DOL,* No. 86–0450 (W.D.Va. Aug. 27, 1986). In compliance with the court's provisional injunctive decrees, DOL certified the growers' hourly rate plus bonus plan for the 1986 season but appealed the grant of preliminary injunction.[6] The district court then consolidated this action with *Senseny South* upon the motion of a worker who had intervened in *Senseny South* as a defendant.

While litigation on the merits of the growers' *Senseny South* action was pending, the growers implemented their hourly rate plus bonus plan and allegedly paid their workers accordingly. The growers did not inform DOL of the specific bonuses being paid once their plans were made final. After the 1986 harvest season, the workers moved and were permitted to amend their complaint in this action to challenge the wages paid under the growers' hourly rate plus bonus plans. In claims stated under the Wagner–Peyser Act and state contract law, the workers alleged that the plan violated the prevailing wage provision in 20 C.F.R. § 653.501(d)(4) (1986) and the H–2 certification regulations in *id.* §§ 655.200, *et seq. See* J.A. at 36 (para. 54), 37 (para. 57, 58).[7] They sought back wages based on the "lawful" piece rate under the regulations, *i.e.,* the prevailing piece rate as adjusted per the *NAACP II* injunction.

With this action thus pending, the district court deconsolidated this action from *Senseny South.* The court found that there was a potential conflict of interest, with DOL aligned with the growers as defendants in this action, but opposing the growers in *Senseny South. See* J.A. at 52–53.

In June 1987, the growers moved to dismiss this action. They contended that there is no private right of action under the Wagner–Peyser Act and, alternatively, that their reasonable reliance upon DOL's approval of their job offers precluded recovery of additional wages by the workers.

In the meantime, in parallel administrative proceedings, DOL had been investigating the growers' hourly rate plus bonus plan. DOL eventually determined that the plans effectively embodied the payment of piece rates that were unlawful under § 655.207(c) and the *NAACP II* injunction. *See* J.A. at 165–66. Accordingly, DOL moved the court to remand the case so it could reconsider its prior grant of approval and the workers moved the court for a stay of proceedings so DOL could determine whether it would impose administrative

---

6. In conjunction with the appeal, DOL sought a stay of the injunction pending appeal. The stay was denied, *Senseny South Corp. v. DOL,* No. 86–2609 (4th Cir. Sept. 22, 1986), and the appeal was eventually dismissed as moot in an unpublished opinion. *Senseny South Corp. v. DOL,* Nos. 86–2609, –2611 (4th Cir. Apr. 15, 1987) (per curiam).

7. The workers alleged that the regulations were incorporated into the contractual working agreements under which they were employed and that violation of the regulations constituted breach of contract.

sanctions against the growers. The workers also moved for leave to file a second amended complaint to add damage claims under the Migrant and Seasonal Agricultural Worker Protection Act (MSAWPA), 29 U.S.C. §§ 1801 *et seq.* These claims were based on the allegation that the growers had promised to comply with all applicable federal laws and regulations and that implementation of the hourly rate plus bonus plans constituted a breach of that promise. DOL eventually chose not to impose administrative sanctions (preclusion from participating in the H–2 program) for the violations, citing "extenuating circumstances." [8]

The district court disposed of all pending matters in a comprehensive order entered in August 1988. First, the court denied, as futile, the workers' motion to amend their complaint to add a claim for damages under MSAWPA. The court held that the growers "reasonably paid wages approved by DOL," thus foreclosing any possibility of recovery under any claim that might be available. The motion to stay pending DOL's decision regarding administrative sanctions was denied as moot. The court also denied DOL's motion to remand, reasoning that the growers were protected from any liability by their reasonable reliance on DOL approval of the wage plans.

The court then addressed the growers' motion to dismiss. The court noted first that because it had "looked outside the pleadings and considered the affidavits and exhibits filed by the parties," it would treat the motion as one for summary judgment. The court declined to decide whether the workers had a private right of action under the Wagner–Peyser Act because it ruled that the growers had reasonably relied on DOL's approval of their wage plans for the 1986 harvest season, and their reliance precluded any recovery by the workers. The court stated that the DOL approved the AEWR-based hourly rate, but also stated that the "applicable pay rate during the 1986 season ... was this hourly rate plus bonus." The court concluded (as a fact not in genuine dispute) that the growers had relied on DOL approval—"The DOL approved the wage rate based on the AEWR, and the Growers had every right to rely on that approval." The court cited the testimony of one of the growers and added that "it is not difficult for this court to perceive the important role which expected labor costs would play in the economic planning of the growers." The court rejected the workers' contrary factual contention because "[t]he fact that the Growers decided to offer a bonus just prior to the picking season does not prove that the Growers did not rely on the DOL approval of the AEWR-based hourly wage." Concluding that "the Growers reasonably relied on the initial DOL approval of the *AEWR-based wage rate plus bonus,*" (emphasis added), the court granted the motion to dismiss on all counts.[9] *Donaldson v. DOL,* No. 86–C–0088(R), 1988 WL 156803 (W.D.Va. Aug. 15, 1988).

This appeal by the workers followed.

## II

Because it was the basis upon which the district court granted summary judg-

---

**8.** The workers appealed the decision of the DOL's Regional Administrator not to impose sanctions, but an ALJ dismissed this claim. The workers then invoked the jurisdiction of the United States District Court for the District of Columbia seeking to have the DOL held in contempt by that court for its failure to abide by that court's still binding injunction in *NAACP II.* In that action they also sought an order compelling the DOL to grant the workers restitutionary relief as a sanction for the growers' violation. Though, significantly, the court concluded that the DOL had "violated the [*NAACP II* injunctive] Order when it granted temporary labor certification to the Virginia growers in 1986," it denied both forms of relief sought. It thought the DOL could not be found in contempt because

the preliminary injunction granted the growers in *Senseny South* had put the DOL under "irreconcilable obligations" as between that provisional decree and the *NAACP II* permanent injunction. And the court concluded that it was without jurisdiction to issue the specific remedial order sought by the workers. *NAACP v. McLaughlin,* 703 F.Supp. 1014, 1017–19 (D.D.C. 1989) (Richey, J.).

**9.** The district court dismissed *sua sponte* all counts against DOL and the other government defendants. The workers have not appealed this ruling. Similarly, the workers have not appealed the district court's denial of the stay and remand motions.

ment, we consider first the question whether, as a matter of law, the growers could be found reasonably to have relied on DOL approval of the hourly rate plus bonus plans under which they allegedly paid the workers during the 1986 harvest season. We conclude that the district court erred in so holding.

Contrary to the district court's predicate findings, the summary judgment record indisputably reveals that the DOL never approved the growers' hourly rate plus bonus plans, so that there could have been no reliance, reasonable or otherwise, upon such approval.[10] Accordingly, assuming that there is available to the workers from some properly invoked source a right of action for underpayment of 1986 wages legally owed, grower reliance on DOL approval of wages offered and paid does not constitute a defense to such an action.

That the DOL never approved the hourly rate plus bonus wage plan under which the growers now contend they paid the workers and which the workers now contend was in violation of their contractual rights is plain from the course of proceedings earlier described. We summarize it again here briefly.

The growers' first job offers proposed a flat hourly rate equal to the AEWR; some of these offers included provisions that the hourly rates "may be supplemented" with "bonuses" in unspecified amounts at the growers' discretion. Responding to these submissions, the DOL, operating then under the "Farmer Memorandum," approved the hourly rate plans but specifically rejected the "plus-bonus" provisions as violative of regulatory disclosure requirements.

At this point, the growers who had included DOL disapproved plus-bonus provisions removed them, thereby bringing their offers into compliance with extant DOL approval. In a new tactical move, however, first one grower, then others, now took the initiative in seeking relief from the DOL's extant *disapproval* of any hourly

rate plus bonus plan by bringing successive civil actions against the DOL in which they claimed that such plans were legal and not subject to administrative disapproval. In conjunction with these actions, they succeeded, on the eve of the harvest season, in obtaining from the United States District Court first a temporary restraining order, then a preliminary injunction which prohibited the DOL from disapproving hourly rate plus bonus job offers pending decision on the merits of their action.

Though by now the DOL had concluded and advised the growers that such plans were in effect disguised piece rate plans that violated applicable regulations and the *NAACP II* injunction, the DOL was of course obliged to comply with the district court's preliminary injunction. Accordingly, though it had resisted grant of that injunction, appealed its entry, and unsuccessfully sought its interim stay pending appeal, the DOL obediently followed the district court's command that it not disapprove the growers' renewed hourly rate plus bonus job offers and certified them.

As is obvious from this account, the DOL cannot be held to have "approved" the growers' hourly rate plus bonus job offer in a way giving rise to any defense of reasonable reliance upon its "approval." All the DOL did was dutifully to obey a provisional injunctive decree whose entry it had resisted and was then properly challenging on appeal. Given the general nature of such a provisional decree and the circumstances of its entry here, the growers could not reasonably have relied upon it as doing anything other than allowing them to proceed with their immediate harvesting needs free of the risk of any *preventive* remedy that the DOL might impose for the violation it had administratively determined to exist. As the growers must be charged with knowing, such a decree decided nothing about the merits of their underlying claim that their current job offers were legally valid ones that the DOL could

---

10. We may assume without deciding that under appropriate circumstances a party's reasonable reliance upon a government agency's legal ruling can give rise to such a defense. *See, e.g.,*

*Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 807 (8th Cir.1979). The deficiency we find is factual, not legal.

not properly reject. It merely decided that all things considered, equity, in the district court's view, mandated maintenance of the status quo pending resolution of that underlying claim. *See University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Under the circumstances, the growers' decision to proceed as they did could not, therefore, be held protected against all future liability by any principle of reasonable reliance. On the contrary, it was taken under the manifest legal and practical risk that their underlying claim might ultimately fail on the merits,[11] thereby exposing them to whatever remedy, other than the preventive one they had forestalled, might then be available to aggrieved workers.

Perhaps aware of the difficulty with the district court's stated basis for dismissing the workers' action, the growers advance alternative grounds upon which the judgment might be affirmed. Neither has merit, and we address them but briefly.

■ The first alternative advanced is that the workers have never properly challenged the hourly rate plus bonus plan under which payments ultimately were made; that their claim as pleaded only challenged and put in issue the AEWR hourly rate first offered. From this, the growers contend that in consequence the district court's reliance theory was properly based upon the undisputed fact that the DOL did initially approve the AEWR hourly rate. This contention fails at several points.

First, the workers adequately challenged the hourly rate plus bonus plan in their first amended complaint. There they plainly alleged that some growers amended their original offers to include discretionary bonuses and paid accordingly, J.A. at

33, and followed this up with the critical allegation that payments of "base [hourly] rate plus a bonus ... violate the Wagner–Peyser Act regulations." J.A. at 36.

Next, it is obvious that the district court considered that the workers had raised this precise issue. Its reliance analysis is directly addressed to that issue. The court noted at one point that "the applicable pay rate ... was this hourly pay rate plus bonus," and its critical ultimate ruling was that "the Growers reasonably relied on the initial DOL approval of the AEWR-based wage rate plus bonus."

■ The other alternative ground advanced is that this issue was effectively removed from this action when the district court deconsolidated this action and *Senseny South*. This is flatly belied by the record. There is no indication that the district court's deconsolidation order was intended to have any such effect. Though there were common issues of law and fact in the two actions—including the dispositive ultimate issue whether the challenged job offers were valid under applicable regulations—the order obviously was not designed to give over resolution of those issues to the *Senseny South* action.[12] The stated basis of the deconsolidation order was simply to relieve the awkwardness resulting from the conflicting party alignments caused by consolidation. The objects of the two actions were completely different: in *Senseny South*, to enjoin at the growers' behest DOL disapproval of the growers' job offer plan; in this action, to recover back wages due the workers because the plans under which they were paid had been disapproved by the DOL.

Accordingly, we reject both of these alternative grounds advanced by the growers

**11.** As events developed, the underlying action in *Senseny South* was ultimately dismissed "with prejudice" by the district court on the grower-plaintiffs' motion, *see* J.A. 300–01, following remand of the action to the district court upon dismissal of the DOL's appeal of the preliminary injunction on mootless grounds. *See supra* note 6.

**12.** Deconsolidation of actions obviously does not of itself give primacy to either action for the resolution of common issues. That is con-

trolled by the normal rules of res judicata which will give preclusive effect to whichever action first goes to final judgment, without regard to the sequence of their commencements. *Restatement (Second) Judgments* § 14, comment a. Here, as earlier noted, *see supra* note 11, *Senseny South* has in fact already gone to final judgment in the form of a voluntary dismissal "with prejudice" of the growers' claim. The implications of that dismissal are not before us on this appeal. *See* Fed.R.Civ.P. 41(a)(2).

for affirming the district court's grant of summary judgment in their behalf.

## III

As indicated, the district court, having found the growers entitled, as against any claim of wage underpayment, to the absolute defense of reliance on DOL approval, did not address on the merits the question whether, in any event, the workers had a private right of action to prosecute such a claim under either the Wagner–Peyser Act, or, as they sought to invoke by amendment to their complaint, the MSAWPA. Because the growers on this appeal continue to assert the lack of any such private right of action as an alternative basis for affirming these judgments, we must address it.

### A

We look first to Wagner–Peyser as a possible source of such a right of action, that being the source actually invoked by the workers in their original and amended complaints. To do this, we must first analyze the gist of the workers' claims under that Act.

As earlier indicated, the gravamen of the workers' amended Wagner–Peyser claim was that the wages paid them under the growers' hourly rate plus bonus plans violated the prevailing wage provision in 20 C.F.R. § 653.501(d)(4) (1986), and the H–2 certification regulations in *id.* §§ 655.200 *et seq.* More specifically, they contended, in opposing the growers' motion to dismiss, that (as the DOL had ruled administratively) these plans were effectively illegal piece rates that violated *id.* § 655.207(c), as interpreted in *NAACP II.*

The question now presented is whether, assuming the growers did violate these (or other) regulations promulgated under Wagner–Peyser, the workers have a private right of action to redress any injury caused them by the violations. The Act does not expressly confer such a right of action. This leaves the question whether one may be implied.

On this question, the courts that have considered it are split, and the split has developed over a period during which the Supreme Court has deliberately tightened the test for judicial implication of private rights of action, beginning with its 1975 decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). On a raw head-count, a majority of courts that have considered the question have found an implied right of action in farmworkers to enforce relevant provisions of Wagner–Peyser and regulations promulgated under it. The leading case so holding, on a careful analysis of the Act and its legislative history, is *Gomez v. Florida State Employment Serv.,* 417 F.2d 569 (5th Cir. 1969), but that decision, though never overruled, pre-dates *Cort.* A number of district courts have followed *Gomez,* some before but several after *Cort,* usually without much discussion of the issue. *See Espinoza v. Stokely–Van Camp, Inc.,* 1980 WL 2098 (N.D.Ill.1980), *aff'd,* 641 F.2d 535 (7th Cir.1981); *De La Fuente v. ICC,* 451 F.Supp. 867 (N.D.Ill.1978); *Jenkins v. S & A Chaissan & Sons,* 449 F.Supp. 216 (S.D. N.Y.1978); *Abraham v. Beatrice Foods Co.,* 418 F.Supp. 1384 (E.D.Wisc.1976); *Galindo v. Del Monte Corp.,* 382 F.Supp. 464 (N.D.Ill.1974).

On the other hand, a number of more recent district court decisions, taking note of the Supreme Court's current restrictive attitude as revealed in *Cort* and its progeny, have declined to find any implied right of action. *See Morrison v. DOL,* 713 F.Supp. 664, 670 (S.D.N.Y.1989) (continued vitality of *Gomez* questioned); *De La Fuente v. Stokely–Van Camp, Inc.,* 514 F.Supp. 68, 76–77 (C.D.Ill.1981) (*Gomez's* continued authority rejected), *aff'd,* 713 F.2d 225 (7th Cir.1983); *see also Frederick County Fruit Growers Ass'n v. McLaughlin,* 703 F.Supp. 1021, 1030 n. 17 (D.D.C. 1989) ("at least questionable").

We think the question is a close one. The original four-factored test of *Cort v. Ash* continues as the basic constraint on our search for an implied right of action, *see Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 2517 n. 9, 110 L.Ed.2d 455 (1990), and it is, as indicated, a

stringent one. But analysis under that test does not yield a perfectly clear answer.

On the first factor, it is hard to quarrel with the *Gomez* court's view that farmworkers such as plaintiffs here are a class for whose "especial benefit" the Act and its implementing regulations were designed. *See Gomez*, 417 F.2d at 571–72, 575–76. Though the main purpose of the Act is to create and provide for administration of an interstate clearance network designed to benefit both growers and workers, the most obvious beneficiaries of those provisions designed to assure the payment of fair wages to those employed through the network are obviously the workers. *Id.*

On the second factor, whether there is any indication, either explicit or implicit, of legislative intent either to create or deny such a right of action, the answer has to be no. There is no indication in the Act or its legislative history as to Congress' intention on this matter, though it may be thought that the deliberate failure to create a private remedy is always a more significant indication of probable legislative intention than is a failure to deny one. In any event, no court of which we are aware has purported to find any significant indication of an intention running either way.

It is in application of the third and fourth factors that the implication of a private right of action becomes most difficult.

The third factor is whether it is consistent with the underlying purpose of the legislative scheme to imply such a remedy. Here, the answer seems to be that it depends to a great extent on how one identifies the underlying purposes of the Act. To the extent the underlying purpose is to make available to seasonal growers a sufficient pool of harvest-time labor, the creation of a private remedy for workers deprived of the Act's concomitant fair-wage protections does not directly further that purpose and in that sense could be thought not consistent with it.

To the extent, however, that an underlying purpose is to set and guarantee fair wages to workers employed through the interstate network, the provision of such a private remedy surely furthers that purpose and is in that sense consistent with it. Indeed, it could be thought inconsistent with that purpose only if the Act or implementing regulations were deemed to have provided wholly sufficient other means for insuring compliance with its fair-wage provisions. As to this possibility, there are regulatory provisions for an administrative complaint procedure through which workers can assert violations of fair-wage provisions of the Act. *See* 20 C.F.R. Part 658. But these make no provision for the award of monetary relief to a successful complainant and indeed provide as the only sanction for violations the disqualification of the violating grower to participate further in the network. *See id.* §§ 655.210, 658.-501, .503. The only provision for monetary relief through this administrative complaint process that is comparable to that available through a private remedy is found in a regulation allowing reinstatement of a grower-violator to be conditioned upon his having made restitution to an aggrieved worker. *Id.* § 658.504(a)(2)(ii). Of course a grower could always avoid such a restitutionary remedy by foregoing further participation, so this is not a remedy of right for workers.

From this, it is obvious that this administrative complaint procedure does not provide the remedies that would be available under a private right of action. While this may well show that implication of a private remedy is not inconsistent with the Act's purposes, it does not compel the obverse determination that implication is "necessary to make effective the congressional purpose." *Cort*, 422 U.S. at 84, 95 S.Ct. at 2090. This could only be asserted with confidence if no other effective means of enforcing the fair wage provisions of the Act could be assumed.

This leads to consideration of the fourth *Cort* factor, which is whether the claim sought to be asserted is one "traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088. On this factor,

we think the balance tips, though not decisively of its own weight, against implication. The claim here is in essence one to recover monetary compensation for underpayment of legally owed wages—*i.e.*, for breach of the most basic obligation of a personal service contract. Such claims are of course a type "traditionally relegated to state law" in an area—the enforcement of personal service contracts between private parties—"basically the concern of the states." *Id.* It is true that the particular breach alleged here is of an obligation imposed by federal law, but that does not make the claim any less one traditionally the concern of state common law remedies. *See Cort*, 422 U.S. at 84, 85, 95 S.Ct. at 2090–91. It surely cannot be said that committing the workers to state common law remedies for breach of contract would completely frustrate the purposes of Wagner–Peyser. *See id.*

Because in the end we think the question a close one, with implication at least a dubious proposition in light of current doctrine, we decline in this case to find a private right of action implicit in Wagner–Peyser. We may do so, reserving the question for another day and another case, because we believe that plaintiffs are entitled to proceed with their claim for underpayment of wages under another federal right of action.

### B

■ As earlier noted, the workers moved for leave to file an amended complaint alleging that the conduct charged to the growers as violations of Wagner–Peyser also violated substantive provisions of the Migrant and Seasonal Agricultural Workers Protection Act (MSAWPA), 29 U.S.C. §§ 1801 *et seq.* The district court denied the motion in conjunction with its summary dismissal of the action on the basis of the growers' reliance on DOL approval of the wages paid. The sole basis given for the denial was futility of the amendment in view of the court's conclusion that grower reliance constituted an absolute defense to any claim for underpayment of wages that could be advanced.

We have now held that under the circumstances reliance did not constitute an across-the-board defense to any and all such claims. That necessarily undercuts the stated basis for the court's denial of the motion to amend. While futility is of course not the only basis for denying a motion to amend under Fed.R.Civ.P. 15(a), it was the only basis relied upon by the district court, and we conclude that no other basis could properly have been invoked in the pre-trial stage at which leave to amend here was sought. *See Ward Elec. Serv., Inc. v. First Commercial Bank*, 819 F.2d 496 (4th Cir.1987).

With the reliance defense out, the amendment properly could have been found futile only if, as a matter of law, it failed to state a claim under MSAWPA. We therefore address that question.

Section 504 of MSAWPA expressly creates a private federal right of action for "[a]ny person aggrieved by a violation of [the Act] or any regulation under [the Act] by a farm labor contractor, agricultural employer, agricultural association, or other person...." The workers sought leave by amendment to invoke this private right of action on two sets of allegations. First, they sought to allege that the grower-defendants (agricultural employers) had violated §§ 1822(a) and 1832(a), which require that agricultural employers such as defendants here "pay the wages owed [migrant and seasonal farmworkers] when due." The specific allegation of underpayment sought to be made under these sections was essentially the same as that made under Wagner–Peyser: that the growers had failed to pay the wages required by 20 C.F.R. § 655.207(c), as interpreted in *NAACP II*, *i.e.*, wages, treated as piece-rate wages, which were therefore subject to the proportional increase mandated by the *NAACP II* injunction.

The amended complaint also sought to allege violations of §§ 1822(c) and 1832(c), which require that agricultural employers such as defendants here not "violate the terms of any working arrangement ... with [migrant and seasonal farmworkers]." The theory of this proposed allegation was

that the "working arrangement" between workers and growers here is the "job offer" made in the clearance process by which, per 20 C.F.R. § 655.203(b), each grower defendant promised to comply with all federal employment related laws, which included, *inter alia,* the violated DOL regulation governing piece-rate wages payable under the H–2 program.

While the effect of allowing such claims to be made under the private right of action conferred by § 504 of MSAWPA is to incorporate into §§ 202 and 302 of MSAWPA the substantive obligations imposed upon agricultural employers by relevant provisions of Wagner–Peyser and INA and their implementing regulations, we are satisfied that this is necessarily contemplated by the interrelated structures of these separate statutory regimes. *See Salazar–Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1341–42 (5th Cir.1985) ("duplication" of interrelated provisions of statutory predecessor of MSAWPA and DOL's H–2 regulations noted); *Frederick County Fruit Growers Ass'n v. McLaughlin,* 703 F.Supp. 1021, 1031 (D.D.C.1989) ("The terms of a job clearance order which reflect DOL requirements become a part of the employment contract as a matter of law.").[13]

Accordingly, we conclude that the amended complaint sought to be pleaded by the workers alleges valid claims under MSAWPA, and that to deny leave to plead it on grounds of futility was erroneous as a matter of law. We therefore reverse the district court's grant of summary judgment and its denial of leave to amend, and we remand for further proceedings consistent with this opinion. In doing so we of course express no opinion on the merits of the claims, except as we have held that they are not barred by the defendants' reliance on DOL approval of any wages offered or paid.

REVERSED AND REMANDED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent because I do not agree with the majority's conclusion that "the district court erred in its factual premise that the DOL had approved in advance the challenged wage payments offered and then made by the growers...." Op. at 341. The majority opinion continues that on that account the district court "necessarily erred in holding that the growers' reasonable reliance on that approval barred any recovery by the workers." Op. at 341.

I think that the district court's factual premise that the DOL had approved in advance the challenged wage payments is not clearly erroneous, thus I do not believe that it erred in holding that the growers' reasonable reliance on that approval barred any recovery by the workers.

I would affirm.

**13.** The defendant-growers complain that to construe the two statutory regimes in this way is simply to bootstrap a private right of action into Wagner–Peyser where none exists by express creation or implication. While there is some surface plausibility in this, it is only that, and it leads nowhere in the end—for two reasons. No principle of statutory construction prevents a private right of action conferred by one statutory regime from drawing substance from provisions of another regime which does not provide such a right of action. *Cf., e.g.,* 42 U.S.C. § 1983. Second, the right of action conferred by § 504 of MSAWPA is one specifically circumscribed in ways which presumably would not confine any right of action found by implication in Wagner–Peyser. The right of action is not, therefore, simply an implied right of action under Wagner–Peyser by another name.